NOT DESIGNATED FOR PUBLICATION

No. 120,362

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of S.B., C.B., and K.B.,
Minor Children.

MEMORANDUM OPINION

Appeal from Chase District Court; JEFFRY J. LARSON, judge. Opinion filed June 14, 2019.
Reversed and remanded.

*Brandy Roy-Bachman*, of Law Office of Brandy Roy-Bachman, of Emporia, for appellants.

*William R. Halvorsen*, county attorney, for appellee State of Kansas, and *Seth Meyer*, of
Cottonwood Falls, guardian ad litem.

Before GARDNER, P.J., GREEN and ATCHESON, JJ.

PER CURIAM: Mother and Father appeal the termination of their parental rights.
They argue that insufficient evidence supported the trial court's findings and rulings that
they would be unfit for the foreseeable future or that termination of their parental rights
was in the best interests of their three children: C.B., S.B., and K.B. Because the record
establishes that the trial court made both legal and factual errors when terminating the
parents' parental rights, we conclude that insufficient evidence supported the trial court's
factual findings and rulings. As a result, we reverse the termination of Mother's and
Father's parental rights and remand for further proceedings.

On April 29, 2016, police removed C.B., born 2001, S.B., born 2006, and K.B.,
born 2009, from Mother's and Father's custody. Police removed the children after being

1

contacted by Mother's and Father's landlord and the children's school. A few days before the children's removal, police helped evict Mother and Father from their home. During the eviction, police found the home in unlivable conditions. Around the same time, the school contacted police that two of the children had truancy issues.

Based on the preceding facts, the State petitioned the trial court to find that C.B., S.B., and K.B. were children in need of care (CINC).

The trial court held a temporary custody hearing. The trial court determined an emergency existed, placing C.B., S.B., and K.B. in State custody because of the following: the children's prior living conditions, the Mother's and Father's current lack of housing, and the children's current truancy issues. The trial court appointed counsel to represent Mother and Father. At the next hearing, Mother and Father stipulated to the allegations of their unfitness. After Mother's and Father's stipulation, the trial court found that C.B., S.B., and K.B. were CINC.

The trial court ordered that the State, through St. Francis Community Services (SFCS), create a case plan task for Mother and Father to complete. Their case plan included the following tasks: (1) maintaining appropriate and clean housing; (2) providing proof bills were up to date; (3) submitting to random walkthroughs of their housing; (4) maintaining appropriate income to meet their children's needs; (5) providing SFCS with employment pay stubs; (6) submitting to random drug testing; (7) completing a parenting class; (8) completing a mental health evaluation and following the evaluation's recommendation; (9) maintaining contact with SFCS; and (10) completing drug and alcohol evaluations and following the evaluation's recommendations.

On March 14, 2017, the trial court determined that reintegration of C.B., S.B., and K.B. with Mother and Father was not a viable goal. As a result, the State moved to terminate Mother's and Father's parental rights.

2

The trial court held a bifurcated termination of parental rights hearing. At the first hearing on August 16, 2017, Mother and Father stipulated that they were "unfit as defined by law." At the second hearing, which was held on September 17, 2018, the CASA advocate and the assigned caseworker from SFCS testified on behalf of the State. Mother and Father testified on their own behalf.

During the hearing, evidence was admitted that Mother and Father had appropriate and clean housing, had completed their parenting class, had maintained weekly contact with SFCS to schedule visits, and had completed their drug and alcohol evaluations. The CASA advocate testified that she knew C.B., S.B., and K.B. wanted to return home to their parents. And the SFCS caseworker testified that Mother's and Father's visitations with C.B., S.B., and K.B. were appropriate. Nevertheless, the CASA and SFCS caseworker both recommended termination of Mother's and Father's parental rights. The CASA and SFCS caseworker testified about Mother's and Father's individual struggles with attending therapy, drug use, and employment.

At the end of the termination hearing, the trial court ruled that termination of Mother's and Father's parental rights was in the best interests of the children. The trial court's factual findings focused on the parents' inconsistent therapy attendance, drug use, and ability to maintain employment. The trial court did not make any findings about the parents being unfit for the foreseeable future at the termination hearing. The next day, the trial court entered a supplemental order which stated that it did not believe that the parents' unfitness was likely to change in the foreseeable future on "the same basis [as] the best interest finding made on the record."

Parents timely appealed.

3

*Did the Trial Court Err When It Terminated Mother's and Father's Parental Rights?*

Because Mother and Father both stipulated to their present unfitness, we need only consider the following two issues: (1) We must consider if there is clear and convincing evidence that Mother's and Father's unfitness is unlikely to change in the foreseeable future. The parents argue that the trial court's finding that they would be unfit for the foreseeable future was not supported by clear and convincing evidence. (2) We must consider if it is in the best interests of the children to terminate Mother's and Father's parental rights. The parents argue that the trial court's finding that termination of their parental rights was in the best interests of their children was not supported by clear and convincing evidence. In making their arguments, the parents also emphasize that they were accomplishing many of the case plan tasks, which they contend the trial court did not consider during the termination hearing.

*Applicable Law*

Parents have a fundamental liberty interest under the Fourteenth Amendment to the United States Constitution that protects the relationship with their children: "A parent's right to the control, custody, and care of children is among the most fundamental rights protected by the United States Constitution." *In re X.D.*, 51 Kan. App. 2d 71, 73, 340 P.3d 1230 (2014). Parents' rights over their children cannot be taken without due process of law. 51 Kan. App. 2d at 73.

To terminate a parent's parental rights, the moving party has the burden of proof. K.S.A. 38-2250. The petitioner must prove to the trial court by clear and convincing evidence that "the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2018 Supp. 38-2269(a).

4

*In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011), this court explained:

> "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.* by clear and convincing evidence, that the parent's rights should be terminated. [Citation omitted.]"

Our Supreme Court has also explained that this court must be "able to discern that the State's evidence was clear and convincing." *In re J.D.C.*, 284 Kan. 155, 170, 159 P.3d 974 (2007). While engaging in this review, this court does not reweigh conflicting evidence, reweigh credibility determinations, or redetermine questions of fact. *Interests of K.L.B.*, 56 Kan. App. 2d 429, 445, 431 P.3d 883 (2018).

Next, if the State establishes that a parent is unfit and unlikely to change in the foreseeable future, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2018 Supp. 38-2269(g)(1). This court reviews the trial court's best interests finding for an abuse of discretion. A trial court abuses its discretion if it is based on an error of law, error of fact, or an otherwise unreasonable decision. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014).

*Procedural Problems*

Before addressing the parents' individual arguments, we note a procedural issue which complicates this case.

5

The trial court determined that reintegration was no longer a viable goal on March 14, 2017. Although otherwise not relevant to this appeal, the trial court held a termination hearing and entered a "default judgment" against the parents, terminating their parental rights for failure to appear at the hearing on November 27, 2017. For reasons unexplained in the record on appeal, all parties agreed to set aside the "default judgment" on December 18, 2017. After setting aside the default judgment, the trial court held multiple permanency hearings where it ruled that reintegration was still the goal. In fact, the June 25, 2018 permanency hearing journal entry immediately preceding the termination of parental rights hearing on September 17, 2018, stated that reintegration was still the goal.

We note that there are different procedures in place once a trial court determines that reintegration is no longer the goal. K.S.A. 2018 Supp. 38-2264(h) provides that at a permanency hearing, if the court finds that reintegration is no longer the goal, and adoption or appointment of a permanent custodian is inappropriate, "the county or district attorney or the county or district attorney's designee shall file a motion to terminate parental rights or a motion to appoint a permanent custodian within 30 days and the court shall set a hearing on such motion within 90 days of the filing of such motion." Moreover, K.S.A. 2018 Supp. 38-2255 states:

> "(e) *Further determinations regarding a child removed from the home*. If custody has been awarded under subsection (d) to a person other than a parent, a permanency plan shall be provided or prepared pursuant to K.S.A. 2018 Supp. 38-2264, and amendments thereto. If a permanency plan is provided at the dispositional hearing, the court may determine whether reintegration is a viable alternative or, if reintegration is not a viable alternative, whether the child should be placed for adoption or a permanent custodian appointed. . . .
>
>      . . . .
>
> "(f) *Proceedings if reintegration is not a viable alternative*. If the court determines that reintegration is not a viable alternative, proceedings to terminate parental rights and permit placement of the child for adoption or appointment of a permanent custodian shall be initiated unless the court finds that compelling reasons have been documented in the

6

case plan why adoption or appointment of a permanent custodian would not be in the best interests of the child. . . ."

The plain language of K.S.A. 33-2264(h) and K.S.A. 38-2555(e) and (f) establish that before a trial court initiates termination proceedings, the trial court must first determine that reintegration of the children with the parents is no longer a viable goal. This provides parents with notice that proceedings to terminate parental rights will soon take place.

Here, the trial court made a determination that reintegration was no longer a viable goal at one point. But it later determined that reintegration was a viable goal. Although under K.S.A. 2018 Supp. 38-2264(g), it seems that the trial court had the authority to do this:

> "When the court finds that reintegration continues to be a viable alternative, the court shall determine whether and, if applicable, when the child will be returned to the parent. *The court may rescind any of its prior dispositional orders and enter any dispositional order authorized by this code or may order that a new plan for the reintegration be prepared and submitted to the court*. . . ." (Emphasis added.)

Yet, by determining that reintegration was a viable goal up until the date of the termination hearing, the trial court failed to follow the plain language of the termination of parental rights statutes.

As a result, the trial court's procedures raises questions whether the parents received adequate notice that their parental rights were going to be terminated. In essence, the trial court backpedaled on its original order that reintegration was no longer a viable goal. This would signal to the parents that they had made improvements. It would also signal to the parents that their rights as parents were not at risk of being terminated. Although the September 17, 2018 hearing was a termination of parental rights

7

hearing, the trial court referred to it as a "permanency hearing." The purpose of a permanency hearing under K.S.A. 2018 Supp. 38-2264 is entirely distinct from a termination of parental rights hearing under K.S.A. 2018 Supp. 38-2269. Additionally, because the parents' rights over their children is a constitutionally protected interest, the trial court's failure to follow the termination of parental rights procedural rules is troubling.

*Therapy Attendance*

Both Mother and Father were to attend therapy as a case plan task. Below, the trial court found that Mother and Father were both unlikely to change in the foreseeable future based on their therapy attendance. The trial court also found that it was in the best interests of the children to terminate both Mother's and Father's parental rights based on their therapy attendance.

When the trial court provided its reasons why termination was in the best interests of the children, the trial court made the following statements about therapy:

">. . . While there is no case law that says there has to be 100 percent compliance, if I was a parent faced with losing the parental rights of my two children, I would make sure that I complied 100 percent with no excuses and I would be contacting [SFCS] on a daily basis asking them, 'Is there anything I can do today to get my kids back?'

"The evidence that's been presented to the Court today leads me to believe that the parents have been somewhat blase about their responsibilities under the reintegration plan. It seems as though whenever they're faced with a question of something they didn't get done, there's some excuse for it. [Mother] indicates that she's missed therapy appointments because she's been sick. My order on January did not say, You don't have to go if you're sick. She says the doctor told her she didn't need to go because she'd make other people sick, at least for one of those. There's another cancellation back in June. [Defense counsel has] been trying to get the Court to focus on what's happened since the last hearing and, frankly, I don't think that's really what's appropriate. The Court has to

8

look at the big picture to see what the parents have done since they stipulated they were unfit back in August.

"The parents, at best, have been inconsistent with what's required of them under the therapy at the Crosswinds. I mentioned [Mother's] missed two sessions since the last hearing and I know prior to that time there were many other therapy appointments that were missed, based upon my reading of previous court reports. [Father] also had a difficult time making it to his therapy appointments with Crosswinds. He now says that he's been released, however, we have no documentation to that effect and the last time he was seen at Crosswinds was, I believe, back in June. I'm sorry, it was July 3rd was the last therapy appointment he had since the last court hearing, . . . according to the court report prepared by [the caseworker].

. . . .

"When I was reviewing the reports, I think [the caseworker] summed up her report, the addendum, quite effectively. 'St. Francis has additional concerns about the lack of commitment to therapy appointments since the last court hearing. Cancelling and no-showing to therapy appointments regularly not only demonstrates a failure to complete this case plan task and obtain the necessary therapy services to be safe and successful parents, but also demonstrates further concerns about the parents' ability to maintain appropriate schedules and structures for the three children if reintegrated back in the home, despite the parents having ample time to prepare for the process and demonstrate their capabilities.'"

When the trial court provided its reasons why the parents' unfitness was unlikely to change in the foreseeable future, the trial court made the following statements about therapy: "The natural mother exhibited inconsistent attendance at Crosswinds for mental health therapy as did the father until such time as the father states he was release[d] from further treatment father offered no corroborating evidence and St. Francis was unable to confirm the father's assertion."

Thus, the trial court took issue with both Mother's and Father's attendance at therapy, believing that this factor constituted clear and convincing evidence that the parents' unfitness would not change in the foreseeable future and that termination was in

9

the best interests of the children. Nevertheless, the parents argue that the trial court ignored the unrebutted testimony at the termination hearing concerning their positive therapy attendance.

A review of the record on appeal establishes that after Mother stipulated to her unfitness, Mother failed to appear at two of her first three therapy appointments. She then went to seven straight appointments between February 13, 2018, and May 25, 2018. She attended her appointments on July 6, 2018, and August 24, 2018, but she failed to attend her appointments on July 23, 2018, August 6, 2018, and September 7, 2018. Mother asserted that she failed to attend these final appointments because of a miscommunication and illness.

The caseworker decided not to contact Crosswinds for "an official update" concerning Mother's "lack of appointments" before the termination hearing. This meant that the caseworker had no information concerning whether Mother was telling the truth about the reasons she missed therapy. This also meant the court had no update on Mother's therapy progress.

Significantly, the only official update on Mother before the court was from March 2018. Crosswinds' analysis of Mother was positive: "[Mother] is focused on gaining back custody of her daughters and is worried about her daughters and is worried about her chances as it comes closer to her court date. [Mother] is forthcoming about her issues and is compliant without all suggestions made by myself, intern counselor." "[Mother] is capable of maintaining a steady pace as observed in therapy session when processing different issues and emotions. [Mother] stays on topic and is highly responsive to interventions used in individual therapy sessions."

As a result, after she stipulated to being unfit, Mother missed two therapy sessions early on, and later missed three therapy sessions shortly before the termination of parental

rights hearing. But she also attended 10 therapy sessions during the time between. In other words, she attended two-thirds of her therapy sessions. Mother also provided reasons why she did not attend the therapy sessions before the termination of parental rights hearing. Yet, the State did not present any evidence to confirm if Mother's explanations for missing those sessions were true because the caseworker failed to follow up with Crosswinds for an official update on Mother's therapy sessions. If we assume for argument sake that Mother's explanations why she missed the final therapy appointments were accurate, then but for illness, she would have attended her final nine therapy appointments.

Here, the trial court took issue with Mother's failure to attend therapy. But the trial court did not actually compare the number of appointments that Mother had attended to those Mother had failed to attend. The trial court did not take note of Mother's progress where she attended seven therapy sessions in a row or her progress in therapy. Instead, the trial court indicated that the parents needed to attend 100 percent of their assigned therapy sessions to prevent termination. But our standard is whether the parent's unfitness is likely to change in the foreseeable future.

In short, when a parent attends nine therapy appointments in a row but for illness, the evidence does not support that it is highly probable that a parent's unfitness is unlikely to change in the foreseeable future. Indeed, even when that parent attends only two-thirds of his or her therapy sessions, the evidence does not support that parent's unfitness was highly unlikely to change in the foreseeable future when the only documentation from the parent's counseling is that he or she is succeeding in that therapy. When this court cannot discern from the State's evidence whether Mother was likely to change in the foreseeable future, then clear and convincing evidence does not exist. See *J.D.C.*, 284 Kan. at 170. Here, because Mother was generally complying with her therapy case plan task, clear and convincing evidence did not support the trial court's finding that Mother's missed therapy appointments supported the termination of her parental rights.

11

As for Father, Father takes issue with the trial court finding that his unfitness was unlikely to change for the foreseeable future because the evidence showed that he attended nearly all of his therapy sessions. Indeed, he argues that the evidence showed that he was released from his task of therapy in July 2018.

To begin with, the trial court found that Father missed therapy sessions. A review of the record shows that Father attended therapy on the following dates:  February 2, 2018, February 12, 2018, March 8, 2018, April 5, 2018, April 19, 2018, and July 3, 2018. On June 1, 2018, Father's therapy was cancelled. On June 12, 2018, Father failed to appear at his therapy. It is unclear why Father's therapy was cancelled, that is, if he cancelled it or if the counselor cancelled it. It is also unclear why Father failed to appear for the June therapy appointments. Regardless, after his July appointment, Father reported that Crosswinds released him from therapy.

Assuming that Father was to blame for missing his two June appointments, Father attended six therapy sessions and missed two therapy sessions—a three-fourths average. As with Mother, the caseworker did not request an official update on Father from Crosswinds before the termination hearing. Therefore, the final official update on Father from Crosswinds was from March 2018. In that update, Father's counselor reported that Father "displayed improvement with completing his tasks assigned by [SFCS]." Moreover, Father's counselor explained that Father "could benefit from treatment for mental health and substance use, but these services [were] not offered by Crosswinds, and therefore not part of the intake's treatment recommendations."

This final point is important because Father's counselor recognized that the services which could benefit Father at Crosswinds were limited. Father's counselor's statement gives credibility to Father's testimony that he was released from therapy in July. Even so, the trial court found that Father's failure to provide evidence corroborating

12

his release meant Father's assertion that his counselor released him from therapy was implausible.

The trial court's findings about Father's therapy attendance are problematic for two reasons. First, when making its findings, the trial court stated, "[Father] also had a difficult time making it to his therapy appointments with Crosswinds." But the trial court did not actually count how many therapy sessions Father attended and missed. Based on the record on appeal, Father attended three-fourths of his therapy sessions over a six-month period. This means that Father was usually complying with this case plan task. As a result, Father's therapy attendance did not support that he was incapable of changing his conduct or condition in the foreseeable future.

Second, as argued by Father in his brief, Father signed releases for SFCS to access his counseling records. Thus, the SFCS caseworker merely needed to contact Crosswinds to determine if Father had been released from therapy. But she did not. More important, the State had the burden of proof to terminate Father's parental rights. Because the State had the burden of proof, when Father stated he had been released from therapy, the State needed to provide clear and convincing evidence establishing that Father had not been released from therapy. Thus, the State could not rely on caseworker's doubts (speculation) that Father actually had been released from therapy. Additionally, the trial court wrongly shifted the burden of proof onto Father by finding Father's contention that he had been released from therapy was not credible because he failed to corroborate it with evidence from Crosswinds. Because the burden of proof was on the State, not Father, the trial court made an error of law when it used Father's failure to corroborate his release from therapy against him.

*Drug Use*

Both parents had case plan tasks requiring them to stay drug free. They also had to submit to drug testing. Mother and Father had to complete a drug and alcohol assessment if they had a diluted test, had a positive test, or had refused a test. They also had to complete and follow the recommendations of their drug and alcohol evaluation.

When the trial court made its best interests findings, the trial court made the following statements about the parents' drug use:

> "THE COURT: [Mother] testified that, as I recall, there was some follicle testing done and she tested positive for methamphetamine. She denies ever using methamphetamine and says, It was the result of some other medication. The Court finds her testimony not credible with regard to that.
> "[DEFENSE COUNSEL:] Actually, Your Honor, the hair follicle test was clean; it was the mouth swab.
> "THE COURT: I stand corrected. Her excuse was still the same with regard to the mouth swab and I'm not buying that. It was a difficult process to even get the parents to submit to the follicle testing. It was scheduled. They missed the first appointment. They have no explanation as to why they missed that appointment, but again, that goes back to, if your kids are on the line, you don't miss appointments, especially when there's a Court order in place that you don't miss appointments."

When the trial court made its unfit for the foreseeable future finding, the trial court stated the following: "Various drug testing modalities were used and results showed drug use by the parents despite their denial of the same. The court specifically finds that the excuses given for positive tests offered by each parent is not credible." Thus, the trial court found that the parents would be unfit for the foreseeable future, and that termination was in the children's best interests based on their failed drug tests.

In their brief, the parents stress that the State never established that the reasons why they failed their drug tests were false. Accordingly, they argue that the trial court's finding that their unfitness was unlikely to change in the foreseeable future was not supported by clear and convincing evidence. The parents' argument is partially correct.

Mother's argument focuses on how her hair follicle drug test results were negative. She asserts that this evidence confirmed that she did not use methamphetamine.

Following her stipulation that she was unfit, Mother provided positive drug test results twice. On May 21, 2018, her mouth swab tested positive for THC. On July 7, 2018, Mother failed to appear for her hair follicle drug test. On July 11, 2018, her mouth swab tested positive for methamphetamine. After testing positive for methamphetamine, Mother stated that she was taking a medication that may have caused a false positive. The caseworker confirmed that this medication could cause a false positive. As a result, the caseworker set up a hair follicle drug test. In her reports to the court, the caseworker described the hair follicle test as a confirmatory test that could detect whether a person consumed drugs within the last 90 days. The confirmatory hair follicle test showed that Mother had not consumed methamphetamine. Moreover, Mother showed up and passed all of her other drug tests.

Because Mother's hair follicle test confirmed that she had not taken methamphetamine, the trial court erred by finding that Mother used methamphetamine based on its belief that her "excuse" was not credible. Although we generally defer to the trial court's credibility determinations, we cannot do so if the trial court made a credibility determination that is contrary to the evidence before it or if the trial court made the credibility determination while ignoring certain evidence. Simply put, the evidence before the trial court was that a scientific test confirmed Mother's assertion that she was not consuming methamphetamine. The trial court ignored this scientific test in making its finding.

15

Father's arguments involve (1) whether he lied to a substance abuse evaluator during an examination and (2) whether he lied while discussing his reasons for using THC. Father asserts that he did not lie to the substance abuse evaluator about his drug use. Yet, we need not consider this argument because the trial court did not rely on the State's assertion that Father lied to the substance abuse evaluator when finding Father unfit for the foreseeable future or terminating Father's parental rights. Instead, the trial court's findings focused entirely on whether Father lied about his drug use.

Concerning whether Father lied while discussing his reasons for using THC, after his unfitness stipulation, Father's mouth swabs were negative for all drugs on March 21, 2018, May 17, 2018, June 13, 2018, and June 29, 2018. His mouth swabs were positive for THC on January 29, 2018, May 16, 2018, and July 11, 2018. He failed to appear for a hair follicle drug test on July 7, 2018. And his hair follicle drug test was positive for THC on August 14, 2018. But his hair follicle drug test was negative on August 28, 2018. Thus, Father submitted four drug tests that were positive for THC.

Yet, we note that Father's August 14, 2018 hair follicle drug test could have detected any THC he consumed in the prior 90 days, that is, no earlier than May 16, 2018. Because Father's August 28, 2018 hair follicle test was negative, it is highly likely that Father's August 14, 2018 hair follicle test was detecting THC already detected by one of Father's mouth swab tests.

As for why he used THC, Father admitted that he used THC before the dates he tested positive. But he alleged that he had been using a friend's vape and was unaware that the friend put THC oil in the vape. He asserted that the last time he knowingly used marijuana was in November 2017. Although Father takes issue with the trial court's determination that his explanation for using THC was not credible, unlike Mother, Father does not assert that the trial court ignored some evidence establishing that he had not

16

used THC. Because this court does not reweigh the trial court's credibility determinations, the trial court did not err by finding Father's reasons for consuming THC not credible. *Interests of K.L.B.*, 56 Kan. App. 2d at 445.

*Employment*

Both Mother and Father were required to maintain appropriate income to meet their children's needs as a case plan task.

Below, the trial court did not make any explicit findings about Mother's employment. Indeed, Mother, who was a certified nurse's assistant, had maintained employment at the same place for six months before the termination of parental rights hearing. She also consistently provided SFCS with pay stubs. But the trial court did make findings about Father's employment:

> "The next issue I've been concerned about is [Father's] employment. This is probably a case that I've never seen somebody move jobs so frequently in such a short period of time. The concern about that is the instability. I think the two parents have managed to maintain sufficient income that they can take care of the kids, but I'm not sure they have the discipline to do it."

As a result, the trial court's employment findings related to the parents' stability and discipline to care for their children.

The parents argue that the trial court's findings were not merited based on Father's employment record. Father points to his testimony about "chang[ing] employment for better pay, better hours, and better flexibility to complete case plan tasks in order to get the children reintegrated back into his home." Thus, Father argues that his job changes should not be seen as instability when he was striving to make improvements for his children.

17

At the termination hearing, Father testified that he recently went through a string of several jobs. Father had been employed at Hopkins between February 23, 2018, and August 10, 2018. He testified that Hopkins terminated him because of attendance; he asserted that it was a miscommunication about whether he was allowed a sick day. After his termination from Hopkins, Father notified SFCS that he would start work at Simmons, but he instead obtained employment at American Eagle. Because American Eagle could not offer him full-time employment, Father soon started working at Hurricane Services full-time. Father testified that working at Hurricane Services was less than ideal because his hours interfered with taking drug tests and because of the inconvenient job site location. According to Father, he quit his job with Hurricane Services after obtaining employment with Fanestil's, which had better hours and pay.

The parents' case plan task was to maintain "appropriate income to meet the needs of the children." The trial court admitted that the parents met this case plan task as it explicitly stated that they had "managed to maintain sufficient income that they [could] take care of the kids." But the trial court believed that Father's frequent job changes between his August 10, 2018 firing from Hopkins and the September 17, 2018 termination hearing established that the parents were unstable and undisciplined. Those findings, however, were not merited from Father's employment history.

To begin with, the trial court's unstable and undisciplined findings as it pertained to the parents involved both Mother and Father. Nevertheless, the only evidence supporting the trial court's findings involved Father's unstable employment history. Because Mother had the same job for six months, the trial court erred by attributing Father's changes in employment to Mother. Simply put, Mother's employment history was stable.

18

Next, Father testified that Hopkins fired him. Otherwise, the only evidence in the record was that Father quit each job he had once he obtained a better job—a better job that made it easier for him to complete his case plan tasks. Those case plan tasks included maintaining appropriate income and submitting to random drug testing. In making its findings, the trial court ignored that Father's job changes had all occurred during the month following his termination from Hopkins. The trial court also ignored (1) that Father was employed at Hopkins for several months before his termination, (2) that Father actively sought reemployment upon his termination, and (3) that upon reemployment, Father actively sought better positions that made it easier to comply with his case plan tasks.

In brief, what the trial court called instability, was Father's attempt to secure the best employment he could to ensure reintegration with his children. This court's standard of review requires the review of *all the evidence*, not just some of the evidence. Even when considered in the light most favorable to the State, because consideration of all the evidence supports that Father was actively seeking reemployment and taking better positions, the trial court's finding that Father's job changes created instability and inconsistency that would somehow be detrimental to the children is not supported by the record on appeal.

*Summary of Evidence*

Thus, to summarize, the trial court found that the parents' unfitness was unlikely to change in the foreseeable future and that termination of the parents' parental rights over C.B., S.B., and K.B. were in their best interests because of the parents' inconsistent therapy attendance, ongoing drug use, and unstable employment record. Nevertheless, to affirm the trial court's findings, this court must be "able to discern that the State's evidence was clear and convincing" after reviewing all the evidence. *J.D.C.*, 284 Kan. at

19

170. Here, the evidence the trial court relied on to terminate Mother's and Father's parental rights was not clear and convincing.

The evidence did not establish that Mother's or Father's therapy attendance was so inconsistent that there was a high probability they would be unfit for the foreseeable future or that termination of their parental rights was in the best interests of their children. Nor did Mother's and Father's employment records establish that they were unstable, requiring termination of their parental rights. Instead, the only clear and convincing evidence before the trial court was that Mother had tested positive for THC once and that Father had tested positive for THC four times after their unfitness stipulation.

But drug use alone is not necessarily a reason to terminate parental rights. See K.S.A. 38-2269(b)(3), (f). In the case of *In re L.C.W.*, 42 Kan. App. 2d 293, 301, 211 P.3d 829 (2009), the trial court reversed the magistrate judge's finding that parents were unfit based on parents' methamphetamine use:

> "'Just because parents use drugs, or have been convicted of using drugs, or drink too much alcohol, does not automatically mean the child is likely to sustain harm, or the home is contrary to the child's welfare. If that were the test, then thousands of children would be removed from the home weekly.
> "'What the State failed to prove was some connection between the parents' alleged (not proven) drug use and the child's welfare. The only evidence was that the child is healthy, was not left alone, and was not abused physically, mentally, or emotionally.'"

This court affirmed the trial court because "L.C.W.'s parents may not be model parents, but we agree with the district court in focusing on the well-being of the child." 42 Kan. App. 2d at 302-03.

In *In re A.M.*, No. 106,890, 2012 WL 2925660, at *5-6 (Kan. App. 2012) (unpublished opinion), this court relied on the *L.C.W.* case to reverse the trial court's finding that father's children were CINC based on his positive drug test for methamphetamine. This court explained its reason for reversing the trial court as follows:

> "[T]he only factor discussed by the trial court was Father's positive drug test for methamphetamine. In many appellate records we have seen the consequences of drug users addicted to methamphetamine. But in the case at bar, as was the case in *L.C.W.*, a CINC case is not about the drug user, it is focused entirely on the care and well-being of the children. This is where the trial court lost its focus.
>
> "There was no evidence presented in this case concerning any inadequate care and well-being of all the children while they were in the Father's custody." 2012 WL 2925660, at *6.

The trial court cannot terminate a parent's right unless there is "clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent *unable to care properly for a child* and the conduct or condition is unlikely to change in the foreseeable future." (Emphasis added.) K.S.A. 2018 Supp. 38-2269(a). When considering the best interests of the child, the trial court "shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2018 Supp. 38-2269(g)(1).

Here, the trial court made no findings about Mother's positive THC drug test. Moreover, although the trial court asserted that it considered the children's physical, mental, and emotional health needs at the conclusion of its findings, the trial court did not explain how either Mother's or Father's THC use would negatively affect the children's physical, mental and emotional health needs. In addition, the trial court never explained how either Mother's or Father's THC use would hamper their ability to properly care for children in the foreseeable future. Instead, the trial court took issue with the fact the parents failed drug tests.

A parent may be unfit for failing to comply with a reasonable reintegration plan. See K.S.A. 2018 Supp. 38-2269(c)(3). Nevertheless, under all the facts of this case, where the only findings by the trial court supporting termination of both Mother's and Father's parental rights is their positive THC drug test results, clear and convincing evidence does not support the termination of Mother's parental rights or Father's parental rights over the children. A rational fact-finder could not find it highly probable that Mother's THC use and Father's THC use alone established that they would be unfit in a manner that would render them unable to care for children for the foreseeable future or that termination of their parental rights was in the best interests of the children.

For the preceding reasons, we reverse the termination of both Mother's and Father's parental rights and remand for further proceedings consistent with this opinion. Because we are reversing the termination of Mother's and Father's parental rights, we need not consider the parents' second argument about their counsel providing ineffective assistance of counsel.

Reversed and remanded.